IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Robert E. Blackburn**

Civil Case No.  01-cv-01451-REB-CBS
(Consolidated with Civil Action Nos. 01-cv-01472-REB-CBS, 01-cv-01527-REB-CBS, 01-cv-01616-REB-CBS, 01-cv-01799-REB-CBS, 01-cv-01930-REB-CBS, 01-cv-02083-REB-CBS, 02-cv-00333-REB-CBS, 02-cv-00374-REB-CBS, 02-cv-00507-REB-CBS, 02-cv-00658-REB-CBS, 02-cv-00755-REB-CBS; 02-cv-00798-REB-CBS, 04-cv-00238-REB-CBS)

In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

[This order applies to Stichting Pensioenfonds ABP v. Qwest, et al, Case No. 04-cv-00238-REB-CBS]

---

**ORDER CONCERNING DEFENDANTS' MOTIONS TO DISMISS
RE: COMPLAINT OF PLAINTIFF STICHTING PENSIOENFONDS ABP**

---

**Blackburn, J**

This matter is before me on the following motions: 1) defendant Gregory Casey's motion to dismiss [#115]; 2) defendant Afshin Mohebbi's motion to dismiss [#117]; 3) defendant Drake Tempest's motion to dismiss [#121]; and 4) defendant Robin Szeliga's motion to dismiss [#124].  All of these motions were filed on September 10, 2004.   The motions are fully briefed.  For the reasons discussed below, some of the motions are denied, and some are granted in part and denied in part.

## I. JURISDICTION

The motions to dismiss listed above concern claims asserted by plaintiff Stichting Pensioenfonds ABP (ABP).  ABP alleges various claims under the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78j(b), and related rules.  I have

federal question jurisdiction over these claims under 28 U.S.C. § 1331.  The plaintiff

also asserts claims under Colorado law.  I have supplemental jurisdiction over these

state law claims under 28 U.S.C. § 1367.

## II.  FACTS

The complaint addressed in the motions to dismiss is ABP's First Amended

Complaint, filed July 7, 2004.  I will refer to this document as the Complaint, and I will

refer to specific paragraphs by their number (e.g., ¶ 1).  Qwest is a publically traded

communications company which provides telephone service and a wide variety of

other communications services in the United States and internationally.  The plaintiff

alleges that Qwest engaged in accounting fraud "designed to create the false

perception that Qwest was a dynamic, growing company that constantly met or

exceeded Wall Street expectations."  ¶ 4.  ABP outlines nine different accounting

manipulations which it alleges Qwest used to factitiously inflate Qwest's financial

performance, and therefore Qwest's stock price.  By mid-2002, according to the

plaintiff, the defendants'

> scheme began to unravel as Qwest's accounting came under
> increasing public scrutiny.  In October and December, 2003, this public
> scrutiny culminated in Qwest restating its financial results for fiscal
> years 2000 and 2001 and for the fiscal quareter ending March 31, 2002.
> Qwest restated its GAAP revenues for this period from $40.674 billion to
> 37.8 billion, an overstatement of **$2.874 billion**, and its losses from
> $4.802 billion to $30.290 billion, an understatement of **$25.488 billion**.

¶ 5 (emphasis in original).

ABP alleges that between July 5, 2000, and March 11, 2002, it purchased over

5.6 million shares of Qwest's common stock in reliance on the defendants'

misstatements and misrepresentations concerning Qwest's financial performance.

¶ 10.  ABP alleges that it suffered more than 100 million dollars in losses when the value of Qwest stock fell substantially "following the disclosure of the Company's fraudulent accounting practices."  ¶¶ 9 - 10.

ABP's Complaint was filed under case number 04-cv-00238-REB-CBS.  That case has been consolidated with the above-captioned case, case number 01-cv-01451-REB-CBS, titled *In re Qwest Communications International, Inc. Securities Litigation*.  In analyzing the sufficiency of the Complaint, the parties sometimes refer to my order concerning motions to dismiss other plaintiffs' similar claims in *In re Qwest*.  *In re Qwest* involves claims under sections 10(b) and 20 A of the 1934 Act, and sections 11 and 15 of the Securities Act of 1933.  When appropriate, I will follow the analyses I used in *In re Qwest*.

ABP alleges that Qwest engaged in nine different accounting manipulations which form the basis of ABP's claims.  The plaintiff's allegations concerning six of the nine alleged manipulations are essentially the same as the allegations in the complaint in *In re Qwest*.  These six alleged manipulations, and the relevant paragraphs in the Complaint, are 1) IRU swap deals (¶¶ 151-232); 2) reciprocal transactions with KMC Telecom (¶¶ 303-312); 3) manipulation of directory revenues (¶¶ 315-319); 4) revenue recognition on the Genuity contract (¶¶ 234-260); 5) accounting for Qwest's interest in KPNQwest (¶¶ 320-330); and 6) accounting for the declining value of network capacity booked as property, plant, and equipment (¶¶ 331-338).  The plaintiff says it has alleged three additional accounting manipulations that are not at issue in the *In re Qwest* complaint.  These alleged manipulations are 7) improper recognition of revenue on IRU sales (¶¶ 128-150); 8) the ASFB transaction

(¶¶ 261-289); and 9) manipulation of pro forma indicators (¶¶ 339-359).

The motions to dismiss addressed in this order were filed by 1) Gregory Casey, a former Executive Vice President of Wholesale Markets at Qwest; 2) Afshin Mohebbi, a former Chief Operating Officer of Qwest; 3) Drake Tempest, a former Executive Vice President, General Counsel, Chief Administrative Officer and Corporate Secretary for Qwest; and 4) Robin Szeliga, Qwest's former Chief Financial Officer. These four individuals are part of a larger group of individual defendants that ABP refers to as the individual defendants. In this order, I will refer to these four individuals as the defendants. Also named as defendants are 1) several other **individual defendants** who were members of the Qwest board of directors, or members of Qwest's senior management, during the relevant times; 2) **Qwest**; 3) the **Anderson defendants**, which include the accounting firm Arthur Andersen, LLP, and Mark Iwan, an audit partner at Arthur Andersen who worked closely with Qwest; and 4) the **Citigroup defendants**, which include Citigroup Global Markets, Inc. (CGMI), formerly known as SolomonSmithBarney, Inc.(SSB), Citigroup Global Market Holdings, Inc. (CGMHI), formerly known as SolomonSmithBarney Holding, Inc. (SSB Holdings), which is a wholly owned subsidiary of Citigroup, Inc. (Citigroup), and an individual named Jack Grubman, who was the primary telecommunications analyst at SSB.

ABP claims that the alleged accounting manipulations at Qwest violated Generally Accepted Accounting Principles (GAAP). GAAP is a widely recognized set of accounting principles, standards, and procedures. However, GAAP is not "a canonical set of rules that will ensure identical accounting treatment of identical

transactions by all accountants." ***Thor Power Tool Co. v. C. I. R.***, 439 U.S. 522, 544 (1979).  Rather, GAAP generally tolerates a range of reasonable treatments, leaving the choice among reasonable treatments to management.  ***Id.***  ABP claims that Qwest's accounting manipulations were undertaken in an effort to falsely inflate Qwest's financial statements to make the company appear more profitable than it was in reality.  These manipulations were, according to ABP, reflected in financial statements made to the investing public, including filings with the SEC.  ABP says many of these financial statements contained material misrepresentations of Qwest's financial position.  ABP alleges that it relied on these misrepresentations when it purchased Qwest stock between July 5, 2000, and March 11, 2002.

Based on the factual allegations in the Complaint, ABP asserts the seventeen claims listed below.  The defendants relevant to the motions to dismiss addressed in this order are highlighted in bold in the following list of claims:

> 1) A claim against Qwest and individual defendants Woodruff, Anschutz, Nacchio, Haines, Slater, Stephens, **Szeliga**, Alvarado, and Hellman under  § 18 of the 1934 Act, 15 U.S.C. § 78r;
>
> 2) A claim against the Andersen defendants under § 18 of the 1934 Act, 15 U.S.C. § 78r;
>
> 3) A claim against Qwest and the **individual defendants** under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5) of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5;
>
> 4) A claim against the Andersen defendants under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5) of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5;
>
> 5)  A claim against Citigroup Global Markets, Inc. (CGMI) and Jack Grubman under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5) of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5;

6) A claim against the **individual defendants** under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a);

7) A claim against Citigroup and Citigroup Global Market Holdings, Inc. (CGMHI) under under Section 20(a) of the 1934 Act;

8) A claim against individual defendants Joe Nacchio and **Robin Szeliga** under § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243;

9) A claim against **all defendants** under the Colorado Securities Act, §§ 11-51-501 & 604, C.R.S.;

10) A claim against the Andersen defendants and the Citigroup defendants for aiding and abetting Qwest's violation of the Colorado Securities Act,       §§ 11-51-501 & 604, C.R.S.;

11) A claim against **all defendants** for common law fraud;

12) A claim against **all defendants** for civil conspiracy;

13) A claim against Citigroup Global Markets, Inc. (CGMI), and Jack Grubman for aiding and abetting common law fraud;

14) A claim against the Andersen defendants for aiding and abetting common law fraud;

15) A claim against **all defendants** for negligent misrepresentation

16) A claim against the Andersen defendants for fraudulent concealment;

17) A claim against Qwest, Arthur Andersen, and SolomonSmithBarney, Inc.(SSB) that they are responsible for the alleged harm caused by the actions of their individual agents, which actions were taken in the scope of the agents' employment.

### III.  STANDARD OF REVIEW

In their motions to dismiss, the defendants argue that the plaintiff's claims

against them must be dismissed because the plaintiff's factual allegations are not

sufficient to support the claims asserted.  For the purpose of ruling on a motion to

dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the complaint is construed in the light

most favorable to plaintiffs, and its allegations are taken as true. ***See, e.g., Daigle v. Shell Oil Co.***, 972 F.2d 1527, 1533 (10th Cir.1992).  In appraising the sufficiency of plaintiff's allegations, "the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." ***Conley v. Gibson,*** 355 U.S. 41, 45-46 (1957).  With regard to some of the plaintiff's claims, the defendants argue that the plaintiff's allegations do not satisfy the particular pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), as stated in 15 U.S.C. § 78u-4(b)(1) and (2).

I note that some of the defendants refer to and adopt arguments made in a motion to dismiss filed by defendant Joseph Nacchio.  All of the motions to dismiss addressed in this order were filed before this case was consolidated with ***In re Qwest***.  The court's docket sheet in the case originally filed by ABP, Stichting Pensioenfonds ABP v. Qwest, et al, Case No. 04-cv-00238-REB-CBS, does not reflect the filing of a motion to dismiss by Nacchio.  Absent a motion to dismiss filed by Nacchio, I cannot consider the arguments the defendants say were made in such a motion.

### IV.  TIMELINESS - § 10(b) AND § 20(a) CLAIMS

ABP filed this suit on February 9, 2004.  The defendants argue that ABP's claims under § 10(b) are time barred.

#### A.  Applicable Period of Limitations

Prior to July 28, 2002, a one year statute of limitations was applicable to claims under § 10(b) and § 20(a).  Section 804 of the Sarbanes-Oxley Act extended the

applicable statute of limitations for any "private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" to the earlier of two years following notice or five years after the occurrence of the facts giving rise to the claim.  28 U.S.C. § 1658 (2004).  The plaintiff's § 10(b) and 20(a) claims are subject to this two year statute of limitations because the Complaint was filed after July 28, 2002.

B.  Events Triggering the Statute of Limitations

In the context of securities fraud, the Tenth Circuit has held that the statute of limitations begins to run "once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1201 (10th Cir. 1998).  The standard outlined in *Sterlin* and similar cases is viewed often as a two step process: 1) the date when the plaintiff was on "inquiry notice" of the possibility of fraud; when there existed "sufficient storm warnings" to alert a reasonable person to the possibility that misleading statements or significant omissions had been made; and 2) the period thereafter during which a diligent investor should have discovered the facts underlying the alleged fraud. *Id*. at 1202 - 05.  The defendants argue that reports issued by Morgan Stanley in June, July, and August, 2001, reports which were critical of Qwest's accounting on various issues, put the plaintiff on inquiry notice of the possibility of fraud at Qwest.  The defendants also cite other press coverage of Qwest, and the filing of the Consolidated Amended Class Action Complaint in *In re Qwest* on December 3, 2001, as events that put the plaintiff on inquiry notice of the possibility of fraud at Qwest.  They argue that ABP had notice of this press coverage and the complaint in *In re Qwest*, and that

this information put ABP on notice of the possibility of fraud.   Given these warnings, the defendants argue that ABP should have discovered the alleged fraud before February 9, 2002, the date two years prior to the filing of the original Complaint in this case.

The allegations in the Complaint indicate that two improprieties alleged in the Complaint were addressed also in the Morgan Stanley reports:1) Qwest's the valuation of its investment in KPNQwest; and 2) Qwest's accounting for swaps and IRU sales.   ¶¶ 730-738.  Nothing in the record indicates that the Morgan Stanley reports described potentially fraudulent practices on a broad range of fronts, as alleged in the Complaint.  If the Morgan Stanley reports constitute storm warnings, they are warnings only of the controversy concerning the valuation of Qwest's investment in KPNQwest and Qwest's swap and IRU transactions, but not of the broader scheme alleged in the Complaint.

It is important to note that ABP alleges also that Qwest undertook a concerted effort to counter the effect of the Morgan Stanley report among investors and analysts, and, thus, to conceal and deny the existence of accounting improprieties.   ¶¶ 730-745.  As alleged, this effort was more than comforting statements to mollify Qwest investors; this was a campaign to make Qwest's practices appear proper to analysts and the investing public.  The plaintiffs allege also that in the few days after Morgan Stanley's June, 2001, report, "Morgan Stanley was blasted by other analysts that covered Qwest, such as SSB, who published reports contradicting Morgan Stanley."  ¶ 71.

The complaints filed in *In re Qwest* in late 2001 likely constitute storm

warnings under **Sterlin**, although such complaints are not necessarily sufficient to alert a reasonable investor to the possibility of fraud.  Given the complexity of the fraudulent scheme alleged by ABP and Qwest's efforts to quell the controversy, rapid discovery of the alleged scheme following such storm warnings cannot reasonably be expected.  Under these circumstances, the passage of six months following the storm warnings is not unreasonable.  Assuming that the Morgan Stanley reports and the complaints in **In re Qwest** did not constitute storm warnings on the issues addressed in those reports and the complaint, those events triggered a duty on the part of the plaintiff to investigate the reported improprieties.  However, under the circumstances of this case, I conclude that the period after these warnings during which a diligent investor should have discovered the basis for the plaintiff's fraud allegations extends to February 9, 2002.  I conclude that the plaintiff's § 10(b) and § 20(a) claims were filed within the applicable two year statute of limitations.

## V.  § 10(b) CLAIMS

Section 10(b) makes it unlawful for any person to employ any manipulative or deceptive device, in contravention of the rules and regulations of the Securities and Exchange Commission (SEC), in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b).  SEC rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates
> or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. s 240.10b-5 (1994). Liability under Rule 10b-5(b) is predicated on an untrue statement of material fact, or omission to state a material fact.  To state a claim under § 10(b) and rule 10b-5(b), a plaintiff must allege that the defendant: a) made an untrue statement of material fact or failed to state a material fact; b) in connection with the purchase or sale of a security; c) with scienter; and d) the plaintiff relied on the misrepresentation and sustained damages as a proximate result of the misrepresentation.  ***See, e.g., Anixter v. Home-Stake Products***, 77 F.3d 1215, 1225 (10th Cir. 1996).  ABP's § 10(b) claims are, in large part, based on allegations that the defendants made materially false statements.

To some extent, ABP argues also that it has stated § 10(b) claims against certain defendants for "scheme liability" under Rule 10b-5(a) or (c).  To state a claim under Rule 10b-5(a) or (c), a plaintiff must allege that the defendant: a) committed a manipulative or deceptive act; b) in furtherance of the alleged scheme to defraud; c) scienter; and d) reliance.  ***See, e.g., In re Global Crossing, Ltd. Securities Litigation***, 322 F.Supp.2d 319, 336 (S.D.N.Y. 2004).

The level of scienter required to support a § 10(b) claim is intent to deceive, manipulate, or defraud.  ***City of Philadelphia v. Fleming Companies, Inc.***, 264 F.3d 1245, 1259 (10th Cir. 2001).   Proof of recklessness is sufficient to establish a § 10(b) claim.  In this context, a defendant acts recklessly when his or her conduct amounts to an extreme departure from the standards of ordinary care, and presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious

that the defendant must have been aware of the danger.  *Id.* at 1260.  In the context of a claim based on non-disclosure of material facts, a plaintiff must show that the defendant 1) knew of the material fact; and 2) knew that failure to reveal the fact likely would mislead investors.  *Fleming*, 264 F.3d at 1261.

The plaintiff alleges that the defendants engaged in a broad scheme to materially overstate Qwest's profitability, and otherwise falsely to enhance Qwest's balance sheet.  According to the plaintiff, the defendants arranged for Qwest to improperly recognize large amounts of revenue on various transactions, to improperly account for costs on various transactions, and otherwise, to cause Qwest's accounting to substantially deviate from accepted standards.  Again, the plaintiff alleges that the defendants engaged in nine different accounting manipulations in their effort to falsely enhance Qwest's balance sheet.

### A.  PSLRA Requirements

A section 10(b) claim is a type of fraud claim.  Under FED. R. CIV. P. 9(b), a plaintiff must plead with particularity the facts supporting a fraud claim.  In addition, the Private Securities Litigation Reform Act of 1995 (PSLRA) imposes particular pleading requirements on complaints alleging securities fraud under § 10(b).  15 U.S.C. § 78u-4(b)(1) and (2).  The PSLRA provides:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant–

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1) and (2).  Generally, the PSLRA is seen as imposing a standard of pleading which is more stringent than that of Rule 9(b).  *Fleming*, 264 F.3d at 1258.

In sum, the PSLRA requires the plaintiffs 1)  to specify each statement alleged to have been misleading, and the reason or reasons the statement is misleading; and 2) with regard to each act or omission alleged to violate § 10(b), to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, i.e. scienter.  *See, e.g., Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1186 (10th Cir. 2003).   Courts must look to the totality of the pleadings to determine whether the plaintiff's allegations support a strong inference of fraudulent intent, or scienter, as required by the PSLRA.  *Fleming*,  264 F.3d at 1262.  In this context, a strong inference of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading."  *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003).  I have considered the totality of the plaintiff's allegations in determining whether those allegations meet the requirements of the PSLRA.

13

When considering the adequacy of an inference of scienter under the PSLRA, a court must consider negative inferences which may be drawn against the plaintiff. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 - 88 (10th Cir. 2003).  In other words, a court must evaluate a plaintiff's suggested inference in the context of other reasonable inferences that may be drawn from the facts alleged.  *Id*.  The inference of scienter suggested by the plaintiff must be strong in light of the overall context of the allegations, including reasonable inferences against the plaintiff's position.  *Id*.

### B.  Group Publication Doctrine

The defendants argue that they cannot be liable under § 10(b) for statements made by others.  The plaintiffs respond that the defendants can be held liable for statements made by others under the doctrine of group publication.  "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."  *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997).  Prospectuses, registration statements, annual reports, press releases, and similar statements are subject to a presumption of collective action.  *Id*.  The false statements alleged in the Complaint all were made in registration statements, prospectuses, SEC forms, or in statements to the press concerning Qwest's financial performance.  All of these statements are subject to a presumption of collective action by corporate directors and officers under the group publication doctrine.

The individual defendants argue that the group publication doctrine was

rendered invalid by the PSLRA. *Schwartz* concerned facts which were not subject to the pleading requirements of the PSLRA. As the individual defendants note, some courts have concluded that the group publication doctrine was rendered invalid by the PSLRA. *See, e.g., In re Capstead Mortg. Corp. Securities Litigation*, 258 F.Supp.2d 533, 561 (N.D. Tex. 2003) (court finds group pleading doctrine irreconcilable with the PSLRA's mandate that plaintiffs plead specific facts as to each act or omission by defendant); *P. Schoenfeld Asset Management LLC v. Cendant Corp.*, 142 F.Supp.2d 589, 620 (D. N.J. 2001) (court refused to recognize the group published information doctrine after passage of PSLRA). However, I conclude that the group publication doctrine was not abrogated by the PSLRA. In *Schaffer v. Evolving Systems, Inc.*, the court concluded that the group publication doctrine was not vitiated by the PSLRA. 29 F.Supp.2d 1213, 1225 (D. Colo. 1998); *see also In re American Banknote Holographics Inc. Securities Litigation*, 93 F. Supp. 2d 424, 442 (S.D. N.Y. 2000). I find the position taken by Judge Brimmer in *Schaffer* to be persuasive, even in light of the Tenth Circuit's later holdings concerning the requirements of the PSLRA as stated in *Fleming*. However, I conclude that there must be some indication that an individual defendant involved in a group published statement was aware of the falsity of the statement. *Adams v. Kinder Morgan, Inc.*, 340 F.3d at 1105-06 (individual's position in company combined with other relevant allegations concerning knowledge or motive can support strong inference of scienter under PSLRA). Absent such awareness, there is no basis to conclude that the defendant acted with scienter concerning that statement. Finally, I note that the application of the group publication doctrine

establishes only the scope of statements which potentially are the subject of § 10(b) liability.  The application of the doctrine, by itself, does not demonstrate a strong inference of scienter.

In my January 13, 2004, order in *In re Qwest*, I concluded that the allegations in the lead plaintiffs' complaint were sufficient to bring Szeliga and Tempest within the group publication doctrine.  For the same reasons, ABP's very similar allegations in its Complaint are sufficient to bring Szeliga and Tempest within the group publication doctrine.  In their motions to dismiss, Mohebbi and Casey argue that ABP's allegations against them are not sufficient to establish that they are subject to liability under the group publication doctrine.  I disagree.

At the times relevant to the Complaint, Mohebbi was President and Chief Operating Officer of Qwest (April 2001 - December 2002;  May, 1999 - June, 2000), and President of Worldwide Operations (June, 2000 - April, 2001).  The facts alleged in the Complaint indicate that Mohebbi was involved in many of the details of Qwest's IRU transactions and capacity swaps, and was aware of the accounting issues raised by these transactions.  Mohebbi also allegedly understood the accounting issues surrounding the valuation of KPNQwest and the value of Qwest's network capactiy.  Mohebbi allegedly played a significant role in responding to criticism of Qwest's accounting concerning the valuation of Qwest's interest in KPNQwest.  The allegations indicating that Mohebbi had knowledge of these transactions and the related accounting issues, and his roles as President and Chief Operating Officer and President of Worldwide Operations, are sufficient to concatenate  Mohebbi to the allegedly false statements based on these

transactions and accounting issues.

On the other hand, nothing in the Complaint indicates that Mohebbi was aware of the alleged manipulations and accounting issues concerning directory revenues, revenue recognition on the Genuity contract and the ASFB contract, and the manipulation of pro forma indicators. Absent some indication that Mohebbi was aware of these manipulations and accounting issues, the group publication doctrine alone cannot subject Mohebbi to liability under § 10(b) for false statements concerning these issues. This is so because the allegations in the Complaint provide no factual basis that would support a conclusion that Mohebbi was aware of the falsity of statements made concerning these transactions.

Casey is alleged to have worked as Executive Vice President of Wholesale Markets and to have worked closely with Mohebbi on IRU and capacity swap transactions. ABP alleges also that he was aware of the accounting issues presented by these transactions. E-mails described in the Complaint indicate that Casey was involved in the preparation of Qwest's financial statements to the extent those statements concern IRU transactions and capacity swaps. However, nothing in the Complaint indicates that Casey was aware of the alleged manipulations and accounting issues concerning the other accounting manipulations alleged in the Complaint. Casey's liability under the group publication doctrine is limited to statements concerning IRU and capacity swap transactions.

<u>C.  Strong Inference of Scienter</u>

Again, the PSLRA requires a plaintiff to allege with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,

i.e. scienter.  The facts alleged must support a strong inference of scienter with regard to each act or omission alleged to violate § 10(b).  The defendants argue that the allegations in the Complaint do not support a strong inference of scienter.

**1.  Knowingly False Statements by Defendants** - ABP sufficiently has alleged that Tempest, Mohebbi, and Szeliga made certain specific public statements that were materially false.  *Plaintiff's opposition*, filed November 19, 2004, p 24.  ABP's allegations concerning these defendants' knowledge of the facts that demonstrated that these statements were false also are sufficient.  Further, as outlined above, ABP sufficiently has alleged that each of the defendants is subject to liability for statements on certain topics under the group publication doctrine.  The defendants also have alleged facts indicating that the defendants were aware that the statements in question were false.

**2.  Scheme Liability** - ABP also argues that it has stated § 10(b) claims against the defendants for "scheme liability" under Rule 10b-5(a) or (c).  To state a claim under Rule 10b-5(a) or (c), a plaintiff must allege that the defendant: a) committed a manipulative or deceptive act; b) in furtherance of the alleged scheme to defraud; c) scienter; and d) reliance.  ***See, e.g., In re Global Crossing, Ltd. Securities Litigation***, 322 F.Supp.2d 319, 336 (S.D.N.Y. 2004).  Here, the defendants' alleged participation in the accounting manipulations described in the Complaint amounts to manipulative or deceptive acts.  As with the other aspects of ABP's § 10(b) claim, these acts sufficiently have been tied to an alleged scheme to defraud.  As discussed below, ABP sufficiently has alleged reliance, or loss causation.  The defendants' alleged knowing participation in such a scheme

supports a finding of a strong inference of scienter.

        **3. Scope and Magnitude of Misrepresentations** - Allegations of pervasive and long-standing accounting machinations, and resulting misstatements, may support a strong inference of scienter under the PSLRA. ***See, e.g., Adams v. Kinder-Morgan, Inc.***, 340 F.3d 1083, 1106 (10th Cir. 2003); ***In re MicroStrategy, Inc. Securities Litigation***, 115 F.Supp.2d 620, 635 (E.D.Va. 2000) (number, size, timing, nature, frequency, and context of accounting manipulations, combined with other circumstances, can provide support for strong inference of scienter); ***In re Raytheon Securities Litigation,*** 157 F.Supp.2d 131, 147 - 48 (D. Mass. 2001) (magnitude of accounting overstatements, combined with other circumstances, can support strong inference of scienter).

        In its Complaint, ABP alleges a sustained pattern of repeated manipulations and misrepresentations over a period of more than two and one-half years. ABP alleges manipulations and misrepresentations of a substantial magnitude amounting to many hundreds of millions of dollars. As alleged, these manipulations and misrepresentations materially affected Qwest's public financial reporting throughout the class period. This is so even when the limited scope of manipulations and misrepresentations applicable to some defendants is considered. For example, I have concluded that the Complaint alleges that Casey was involved only in manipulations and misrepresentations concerning IRU transactions and capacity swaps. Still, the scope and magnitude of these alleged manipulations and misrepresentations is large enough to provide substantial support for a strong inference of scienter. As to each of the defendants under

consideration here, the scope and magnitude of the accounting manipulations and misrepresentations alleged by ABP support a strong inference of scienter.

4. **Motive and Opportunity** - Allegations concerning a defendant's motive and opportunity to commit securities fraud may be considered in determining whether the "plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter." *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1263 (10th Cir. 2001). To establish scienter by pleading motive and opportunity, the plaintiff must allege that the defendant benefitted from the alleged fraud in some concrete and personal way, "as when the defendants made material misrepresentations to maintain a high stock price and then sold their own shares at a profit." *Id.* at 1261, *citing Novak v. Kaskas*, 216 F.3d 300, 307 - 08 (2nd Cir. 2000) (pre PSLRA). Allegation of a personal benefit, however, is not required to establish a strong inference of scienter.

As Mohebbi notes, ABP has withdrawn its allegation that Mohebbi sold Qwest stock at any time relevant to ABP's claims. ABP does not allege that Casey sold stock in order to profit from the alleged fraud. Stock sales do not support a strong inference of scienter as to Mohebbi or Casey. Previously, I have concluded that stock sales by Szeliga and Tempest provide support for a strong inference of scienter. *In re Qwest Communications International, Inc. Securities Litigation*, Order filed January 13, 2004, pp. 24-28, 2004 U.S. Dist. Lexis 584, *38 - *48. That conclusion equally is applicable here.

5. **Conclusion** - Having considered ABP's allegations and inferences that reasonably can be drawn both against and in favor of the defendants, I conclude that

ABP's allegations concerning the defendants are sufficient to support a strong inference of scienter as to the statements, manipulations, and scheme participation properly attributable to the defendants. ABP has alleged specific facts indicating that Tempest, Szeliga, Mohebbi, and Casey were aware of the improper manipulations alleged by ABP. Further, ABP sufficiently has alleged that the defendants made statements or were sufficiently connected to group statements that they knew to be false, and knowingly participated in a scheme to defraud that supported the allegedly false statements. The alleged manipulations and statements were part of a pervasive and long-standing series of accounting machinations and resulting misstatements. These alleged facts support a strong inference of scienter as to the defendants. To the extent Tempest and Szeliga sold stock and allegedly benefitted from the artificially inflated price of Qwest stock, those sales provide additional support for the strong inference of scienter.

### D. Loss Causation

I disagree with Tempest and Szeliga's argument that ABP has not pled loss causation sufficiently. ABP has pled sufficient facts to indicate that the defendants' alleged fraud was a significant cause of the losses it allegedly suffered from its investment in Qwest stock. Tempest and Szeliga, adopting an argument made by defendants Anshutz and Slater, propose that the court "take judicial notice of the burst of the notorious internet bubble" as the cause of ABP's losses. *Anschutz & Slater's Motion to Dismiss*, p. 19 (citing ***In re Merrill Lynch & Co. Research Reports Securities Litiation***, 289 F. Supp. 2d 416, 419 (S.D.N.Y 2003)). While it is readily conceivable that the burst of the so-called internet bubble played a role in causing

ABP's losses, that possibility does not preclude ABP from alleging that the defendants' false statements concerning Qwest's financial status was a significant cause, or even the primary cause, of its losses.  ABP sufficiently has alleged such a causal connection.

## VI.  § 18 CLAIM

Adopting arguments asserted by Qwest concerning ABP's § 18 claim, Szeliga argues that this claim should at least be limited.  In my March 28, 2005, order concerning Qwest's motions to dismiss ABP's Complaint, I concluded that ABP's § 18 claim alleges reliance only on Qwest's form 10-K's for the years 1999 and 2000. *Order*, filed March 28, 2005, p. 36-37.  On its own terms, ABP's § 18 claim is so limited.  Szeliga is correct that ABP's § 18 claim is limited to Qwest's form 10-K's for the years 1999 and 2000.  Because ABP's Complaint defines this limitation, no order limiting ABP's § 18 claim is necessary.

## VII.  § 20(a) CLAIM

Szeliga, Casey, and Tempest argue that ABP's claim under § 20(a) must be dismissed.  Under § 20(a), "a person who controls a party that commits a  violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher v. Durango Metals, Inc*., 144 F.3d 1302, 1305 (10th Cir. 1998); 15 U.S.C. § 78t.  "To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305.  To the extent ABP has alleged § 10(b) claims against another defendant, a control person may be subject to § 20(a) liability if the control element of this claim adequately has

been alleged.

The plaintiff need not "show the defendant actually or culpably participated in the primary violation." *Id*. (quotation and citation omitted). To allege control sufficiently, a plaintiff must plead facts from which it can be reasonably be inferred that the defendant was a control person. *Id*. at 1306. To make this showing, the plaintiffs must allege facts that indicate that the defendant had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id*. at 1305; *see also Adams v. Kinder-Morgan, Inc*., 340 F.3d 1083, 1108 (10th Cir. 2003).

Section 20(a) "has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable." *Id*. at 1305 (internal quotations omitted).

> The SEC's definition of "control" reflects this remedial purpose: "control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

*Id*.

Casey and Tempest argue that ABP has not alleged facts indicating that they had sufficient control over primary violators. Szeliga's only argument concerning the § 20(a) claim against her is that this claim must be dismissed to the extent ABP's underlying Exchange Act claims are dismissed.

ABP argues that it sufficiently has alleged that Casey had control over Qwest's capacity swap transactions, which allegedly were one basis for the

securities fraud alleged in the Complaint.  According to the Complaint, Casey, as Executive Vice President of Wholesale Markets, was one of the principal officers in charge of the division of Qwest that orchestrated the capacity swap transactions. *Complaint*, ¶ 30.  As summarized in ABP's opposition to the individual defendants' motion to dismiss, ABP has alleged that Casey held substantial control over the capacity swap transactions.  *ABP's opposition to individual defendants' motion to dismiss*, pp. 32-33; *Complaint*, ¶ 30, 222-230.  These allegations are sufficient to allege that Casey had control over Qwest's capacity swap transactions for the purpose of a § 20(a) claim.

However, ABP has not alleged that Casey had control over the manipulation of directory revenues, revenue recognition on the Genuity contract, accounting for Qwest's interest in KPNQwest, the valuation of Qwest's network capacity, the ASFB transaction, and the manipulation of pro forma indicators.  Therefore, Casey's motion to dismiss the § 20(a) claim should be granted as to alleged accounting manipulations not involving IRU or capacity swap transactions.

In its response to the individual defendants' motions to dismiss, ABP does not respond to Tempest's argument that ABP has not sufficiently alleged a § 20(a) claim against Tempest.  In its Complaint, ABP alleges that Tempest was Qwest's Executive Vice President, General Counsel, Chief Administrative Officer and Corporate Secretary.  *Complaint*, ¶ 28.  ABP has not pointed to any specific allegations in the Complaint that indicate that Tempest had control over any of the primary violators who committed the violations alleged in the Complaint, and the court has not noted any such allegations in its review of the Complaint.  I note that

the Complaint is over 300 pages long.  The court's practice standards require "specific references in the form of pinpoint citations" to identify relevant excerpts from a document.  REB Civ. Practice Standard II.D.2.  If there are specific allegations concerning Tempest's control over primary violators, its is ABP's burden to cite specifically to those allegations.  **See Phillips v. James**, ___ F.3d ___, 2005 U.S. App. Lexis 19074, *13, No. 03-4272, slip op. at 10 (10th Cir. September 2, 2005) (absent specific citation to record by plaintiff, court will not sift through record for support for argument).  Absent allegations that indicate that Tempest had control over any of the primary violators who committed the violations alleged in the Complaint, ABP has not stated a § 20(a) claim against Tempest.

Again, Szeliga's only argument concerning the § 20(a) claim against her is that this claim must be dismissed to the extent ABP's underlying Exchange Act claims are dismissed.  None of those claims will be dismissed, and Szeliga is not entitled to dismissal of the § 20(a) claim against her on this basis.

### VIII. § 304 OF THE SARBANES OXLEY ACT

ABP asserts a claim against Szeliga under subsection (a) of § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243.  This statute provides:

(a) Additional compensation prior to noncompliance with Commission financial reporting requirements

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for--

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission

(whichever first occurs) of the financial document embodying such financial reporting requirement; and

(2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C.A. § 7243(a).

Szeliga argues that ABP does not have standing to assert a claim under § 304 because the statute provides only for reimbursement to the issuer which, in this case, is Qwest. ABP is not entitled to the reimbursement required by the statute, and ABP is not asserting derivative claims on behalf of Qwest. Because ABP is not entitled to the relief authorized by the statute, I conclude that ABP does not have standing to assert a claim against Szeliga under § 304. This claim should be dismissed as to Szeliga.

## IX.  STATE LAW CLAIMS - STATUTE OF LIMITATIONS

Some of the defendants argue that ABP's state law claims for civil conspiracy, negligent misrepresentation, and respondeat superior are barred by the applicable statute of limitations. In essence, the defendants argue that the two year statute of limitations defined in §13-80-102(1)(a), C.R.S., applies to these state law claims. Section 102(1)(a) applies to "(t)ort actions, including but not limited to actions for negligence, trespass, malicious abuse of process, malicious prosecution, (and other actions)." ABP argues that the three year statute of limitations of §13-80-101(c), C.R.S., is applicable. Section 101(c) applies to civil actions "for fraud, misrepresentation, concealment, or deceit . . . ."

The plaintiff's claims under §11-51-604, C.R.S., part of the Colorado Securities Act, are, in essence, claims based on alleged misrepresentations or

fraud.  The plaintiff's claims for common law fraud, for negligent misrepresentation, and for fraudulent concealment are, of course, claims based on allegations of fraud or misrepresentation.  The plaintiff's civil conspiracy claim alleges a conspiracy to "misrepresent Qwest's true financial condition."  ¶ 842.  All of these claims are claims "for fraud, misrepresentation, concealment, or deceit . . . ."  §13-80-101(c), C.R.S.  Thus, the three year statute of limitations of §13-80-101(c) controls.

In essence, the defendants argue that ABP reasonably should have discovered the factual basis for these claims by the end of 2001, more than two years before the Complaint was filed in this case.  For the reasons discussed in Section IV of this order, I conclude that ABP should not reasonably have discovered the factual basis for these claims prior to February 9, 2002, the date two years before this case was filed.  Thus, ABP's Complaint was filed within the applicable three year statute of limitations.

## X.  STATE LAW CLAIMS - FAILURE TO STATE A CLAIM

Addressing ABP's claims under state law, the defendants argue that the allegations in ABP's Complaint do not state claims for negligent misrepresentation, relief under the Colorado Securities Act, common law fraud, or civil conspiracy.

### A.  Negligent Misrepresentation

Some of the defendants argue that ABP's allegations are not sufficient to state a claim for negligent misrepresentation under Colorado law.  The defendants argue that they owed no duty to the plaintiff, and that the economic loss rule bars such a claim.

The Colorado courts have adopted the Restatement (Second) of Torts §

552(1) (1976), and its definition of a claim of negligent misrepresentation:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Fluid Technology, Inc. v. CVJ Axles, Inc.*, 964 P.2d 614, 616 (Colo.App.,1998) (citing Restatement (Second) of Torts § 552(1) (1976)). The plaintiff has alleged that the defendants, in the course of their business, profession, or employment, supplied false information to the market concerning Qwest's business, which information was known to be used as a guide by those investing in Qwest stock, and which information was known to have an affect on the price of Qwest stock. The plaintiffs claim to have relied justifiably on the false information provided by the defendants, and to have suffered a financial loss as a result of their reliance on this information. The facts alleged by the plaintiff are sufficient to state a claim for negligent misrepresentation.

The defendants argue also that the economic loss rule prohibits the plaintiff from pursuing a negligent misrepresentation claim. The Colorado Supreme Court has said that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (2000). The court described the rule in similar terms in *Town of Alma v. Azco Construction, Inc.*, 10 P.3d 1256, 1264 (2000). The rule "serves to maintain a distinction between contract and tort law." *Id.* at 1262.

In the present case, there is no need to preserve this distinction. ABP does not assert any claims that sound in contract. Its negligent misrepresentation claim is based on the duty, established in Colorado law, to exercise reasonable care when supplying information for the guidance of others in their business transactions. Assuming the allegations of the Complaint to be true, the plaintiff may be able to establish that the defendants tortiously breached this duty. In short, applying the notice pleading standard of FED. R. CIV. P. 8, I conclude that ABP has stated a claim for negligent misrepresentation against the defendants.

## B. Colorado Securities Act

ABP asserts a claim under § 11-51-604(3), C.R.S., part of the Colorado Securities Act. Section 604(3) provides, in relevant part

> (3) Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-501(1) . . . is liable to the person buying or selling such security . . . in connection with the violation for such legal or equitable relief that the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.

Section 11-51-501(1) provides

> (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
>
> (a) To employ any device, scheme, or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

The defendants argue that the language of § 604(3) indicates that a claim for

violation of that section, based on an underlying violation of § 501(1), can be brought only when there is privity between the plaintiff and the defendant; only when the plaintiff alleges that the plaintiff purchased or sold a security from or to the defendant.

Although § 604(3) can be read to include a privity requirement, I find that the holding of the Colorado Supreme Court in **Rosenthal v. Dean Whitter Reynolds, Inc.**, precludes such a reading. 908 P.2d 1095 (Colo. 1995). The **Rosenthal** court applied § 11-51-125(2), the predecessor of §604(3). Section 125(2) read,

> Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-123 [the predecessor of § 501(1)] is liable to the person buying or selling a security in connection with the violation for such legal or equitable relief which the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.

The language of § 125(2) is nearly identical to that of § 604. The **Rosenthal** court held,

> to state a claim pursuant to section 11-51-125(2), a plaintiff must allege the following:  (1) that the plaintiff is a purchaser or seller of a security;  (2) that the security is a "security";  (3) that the defendant acted with the requisite scienter;  (4) that the defendant's conduct was in connection with the purchase or sale of a security;  (5) that the defendant's conduct was in violation of section 11-51-123 [the predecessor of § 501(1)];  and (6) that plaintiff relied upon defendant's conduct to his or her detriment, or that defendant's conduct caused plaintiff's injury.

**Rosenthal**, 908 P.2d at 1102.  These elements, adopted by the Colorado Supreme Court, do not include a privity requirement.  ABP's claim under § 604(3) is not subject to dismissal for failure to allege privity between ABP and the defendants.

### C.  Common Law Fraud

The defendants argue that ABP's allegations do not support a common law

fraud claim because they do not satisfy the specificity requirement of FED. R. CIV. P. 9(b), because ABP has not pled actual reliance with specificity, and because the plaintiff has not pled proximate cause adequately.  I conclude that, to the extent ABP adequately has pled § 10(b) claims against the defendants, it also has adequately pled common law fraud claims against the defendants.

### D.  Civil Conspiracy

> There are five elements required to establish a civil conspiracy in Colorado.  [T]here must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.

*Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 502 (Colo.1989).  ABP alleges that "Qwest and the Individual Defendants on the one hand, and Andersen Defendants and/or the Citigroup Defendants, on the other hand, engaged in a conspiracy the object of which was to misrepresent Qwest's true financial condition."  ¶ 843.  The defendants  argue that the Complaint does not include sufficient factual allegations indicating that the defendants entered into an agreement to accomplish an unlawful purpose.  I find that the Complaint adequately alleges actions by the defendants that are sufficient to support an inference that the defendants agreed to undertake the alleged conspiracy.  The plaintiff adequately has alleged a variety of unlawful acts taken by various defendants in the course of this effort, and it has alleged that the misrepresentation of Qwest's finances to the public caused it harm.  This is sufficient to state a claim for civil conspiracy under Colorado law.

To the extent the civil conspiracy claim is based on acts that are unlawful because they constitute fraud, I conclude that the fraudulent acts must be pled

under the standard of Rule 9(b).  To the extent ABP adequately has pled § 10(b)

claims against the defendnats, ABP adequately has pled fraud concerning those

misrepresentations.  These misrepresentations also can form a basis for ABP's

civil conspiracy claim.  Further, the negligent misrepresentations alleged by ABP

also are unlawful, and also can form a basis for the civil conspiracy claim.  The

defendants' motions to dismiss ABP's civil conspiracy claim are denied.

## XI.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1)  That defendant Gregory Casey's motion to dismiss [#115], filed

September 10, 2004, is **GRANTED** as to the plaintiff's claim under § 10(b), 15 U.S.C.

§ 78j(b), and common law fraud claims to the extent those claims are based on

alleged misrepresentations concerning Qwest's directory revenues, revenue

recognition on the Genuity contract, the valuation of KPNQwest, the valuation of

Qwest's network capacity, the ASFB transaction, and the manipulation of pro forma

indicators;

2)  That defendant Gregory Casey's motion to dismiss [#115], filed

September 10, 2004, is **GRANTED** as to the plaintiff's claim under § 20(a), 15 U.S.C.

§ 78t, to the extent that claim is based on alleged misrepresentations concerning

Qwest's directory revenues, revenue recognition on the Genuity contract, the

valuation of KPNQwest, the valuation of Qwest's network capacity, the ASFB

transaction, and the manipulation of pro forma indicators;

3)  That defendant Gregory Casey's motion to dismiss [#115], filed

September 10, 2004, otherwise is **DENIED**;

4) That defendant Afshin Mohebbi's motion to dismiss [#117], filed September 10, 2004, is **GRANTED** as to the plaintiff's claim under § 10(b), 15 U.S.C. § 78j(b), and common law fraud claim to the extent those claims are based on alleged misrepresentations concerning Qwest's directory revenues, revenue recognition on the Genuity contract, the ASFB transaction, and manipulation of pro forma indicators;

5)  That defendant Afshin Mohebbi's motion to dismiss [#117], filed September 10, 2004, otherwise is **DENIED**;

6) That defendant Drake Tempest's motion to dismiss [#121], filed September 10, 2004, is **GRANTED** as to the plaintiff's claim under § 20(a), 15 U.S.C. § 78t;

7)  That defendant Drake Tempest's motion to dismiss [#121], filed September 10, 2004, otherwise is **DENIED**; and

8) That defendant Robin Szeliga's motion to dismiss [#124], filed September 10, 2004, is **DENIED**.

Dated September 12, 2005, at Denver, Colorado.

BY THE COURT:

s/ Robert E. Blackburn
Robert E. Blackburn
United States District Judge